DISSENT
SUTTON, Circuit Judge,
dissenting.
This case is moot. Unan and Quintino filed this lawsuit to require Michigan to fix an error in its computer system that assigned non-citizens to the wrong Medicaid eligibility category. Michigan has done just that. Unan and Quintino also asked Michigan to provide them and the members of a putative class Medicaid benefits and constitutionally adequate notice. Michigan has done that too — for every member of the putative class. At this point, Unan and Quintino cannot identify a single immigrant covered by their putative class action to whom the State should be providing benefits but is not.
The explanation for the plaintiffs’ request to continue the case at this point is not that the State will change its mind and undo the fix to its computer system. It’s that the State may make another mistake in the future in allocating these benefits. The premise is accurate; the conclusion is not. No public agency, including this court, can insulate itself from the possibility of future mistakes. If the possibility of future mistakes suffices to invoke the “picking off’ and “inherently transitory” exceptions to mootness, I am hard pressed to understand when they would not apply to the implementation of an ongoing benefits program. Instead of “narrow” exceptions to the mootness doctrine, Gerstein v. Pugh, 420 U.S. 103, 110 n.11, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), they would become Article III overrides, sufficiently elastic to apply whenever this or that claimant wanted to apply them. No State can guarantee that its computer systems will operate flawlessly for every applicant, whether immigrant or citizen, and correctly assign Medicaid benefits. That is an unclimbable mountain. I would follow Judge Battani’s *295 lead, dismiss this case as moot, and reject the plaintiffs’ reliance on the “picking off’ and “inherently transitory” exceptions to mootness. The majority seeing it otherwise, I respectfully dissent.
The “picking off’ exception to mootness does not apply in this instance for a straightforward reason. Michigan did not “strategically avoid[ ] litigation by settling or buying off individual named plaintiffs.” Lead Op. at 285 (emphasis added). It “picked off’ the entire putative class— which is to say it gave everyone just what they wanted. If that’s what we call “picking off,” I doubt there is a potential claimant in the country that would object to it. Since when, moreover, is it the business of the federal courts to punish, or to be suspicious about, this form of state action? Michigan fixed the computer problem that “wrongfully den[ied] comprehensive Medicaid, and instead assign[ed] ESO [Emergency Services Only] Medicaid, to eligible Michigan residents who are qualified aliens” by the end of 2014. R. 1 at 47. And by April 2015, the Michigan Department of Community Health and Human Services had reprocessed thousands of Medicaid applications and retroactively given full Medicaid benefits to the 2,895 individuals whom the Department had moved to Emergency Services Only coverage but had not yet sent revised notices to. The Department began mailing revised notices, which Unan and Quintino accept as constitutionally adequate, to new Emergency Services Only recipients on May 4, 2015. That’s all the complaint asked for. Once received, that relief required an Article III court to dismiss the case as moot, just as the district court correctly did.
The exception also does not apply for a second reason. The Supreme Court has applied the exception only after the district court has ruled on class certification, not before. See Deposit Guar. Nat’l Bank v. Roper, 445 U.S. 326, 339-40, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980). The lead opinion’s application of the “picking off’ exception overlooks the reason that the Supreme Court considered that concern in the first place: to “[p]ermit[ ] appeal of the district court’s certification ruling.” Id. at 339, 100 S.Ct. 1166. In this case, there is no certification ruling and no remaining member of the putative class either. The Department made the putative class whole; it didn’t “pick off’ a few named plaintiffs to prevent review of a class-certification order.
Wilson v. Gordon, 822 F.3d 934 (6th Cir. 2016), does not lead to a contrary result. In that case, Tennessee limited its actions to named plaintiffs and a small portion of the putative class. Id. at 941. In this case, Michigan granted relief to the entire putative class. That’s called capitulation, not maneuvering — a surrender, not a strategic retreat. The idea behind the “picking off’ exception is the risk of “invit[ing] waste of judicial resources by stimulating successive suits brought by others claiming ag-grievement.” Roper, 445 U.S. at 339, 100 S.Ct. 1166. How is that a risk here? Neither the plaintiffs nor the lead opinion can identify a single putative class member who remains aggrieved.
Nor is the timing of relief suspect. Hundreds of thousands of Michigan residents became eligible for Medicaid for the first time on April 1, 2014. While struggling to process the influx of applications, the Department became aware of problems with the computer system on April 14, 2014, and immediately began to correct the issue for all applicants. The Center for Civil Justice contacted the Department about the issue, and the Department promised to' fix the problem by the end of the year and to use a manual override to provide Medicaid benefits to eligible residents in the meantime. By August 3, 2014, the Depart *296 ment had implemented a short-term fix to the computer systems so that post-August 3 applicants claiming éligible immigration status received full Medicaid and an opportunity to dispute any contrary assignment. All of that happened before Unan and Quintino filed this lawsuit.
When the plaintiffs sued the Department, Michigan promptly gave Unan and Quintino comprehensive Medicaid benefits. The Department did the same for any eligible individual, whether Maria Vargas, her husband, or anyone else who notified the Department of an error.
True, the Department restored benefits to these individuals on an ad hoc basis. True also, that happened in one sense in Wilson. But in contrast to Wilson, where a new ad hoc process for a limited slice of the putative class was the only procedural change the State made, the Department’s ad hoc reassignments took place alongside an ongoing and comprehensive computer system fix. 822 F.3d at 951. Michigan has fixed the computer system and reprocessed all of the applications through this established, standardized procedure. On this record, no one who should be receiving benefits is not receiving benefits. What more can plaintiffs or the court fairly ask of the State? And what good would it do to wait to run the named and potential plaintiffs’ applications back through the now fixed computer system? To apply the “picking off’ exception here, it seems to me, runs the risk of turning it into a caricature and encourages defendants to delay relief until the comprehensive fix is already in place. The reality that the Department initially granted a few applicants relief on a case-by-case basis does not grant us jurisdiction over this class action years after plaintiffs received all of the benefits they asked for and were entitled to, and years after the Department had established a standardized procedure to deal with similar concerns.
The “inherently transitory” exception fares no better. Wilson identified two requirements for applying this exception: “(1) that the injury be so transitory that it would likely evade review by becoming moot before the district court can rule on class certification, and (2) that it is certain other class members are suffering the injury.” Id. at 945. Tennessee conceded the second requirement in Wilson. But Michigan challenges it here. And it’s the failure to meet the second requirement that should end this case. Unlike Wilson, where Tennessee provided speedy Medicaid determinations only for the named plaintiffs and 100 individuals of their choosing, id. the Department has resolved the computer issues for all putative class members and sends adequate notice to all new applicants with indeterminate immigration status.
The record evidence since the computer fixes bear this out. From May 19, 2015 to August 14, 2015, the Department received 150,641 Medicaid applications for 230,217 individuals. It assigned Emergency Services Only for just 3,595 cases and 4,378 individuals. “218 of the cases, affecting 246 individuals, were erroneously assigned ESO,” which means that “[0].015% of total Medicaid applications resulted in an erroneous ESO assignment and [0].011% of individuals seeking Medicaid were erroneously assigned ESO.... Looking only at the ESO assignments, 6.1% of ESO case assignments were erroneous and 5.6% of ESO assignments for individuals were erroneous.” R. 69-2 at 4-5. At oral argument, Unan and Quintino acknowledged that they could not point to any putative class member still affected by the glitch in the computer system. By all accounts, the targeted error thus no longer exists. On what basis, then, can we reverse Judge Battani’s decision? None, at least that I can see.
*297 Even though Judge White shares many of my concerns about applying the inherently transitory exception here, she nonetheless believes that the case is not moot because “plaintiffs produced an email showing that even after the state implemented a permanent fix to its computer system, the system ‘flipped’ multiple applicants who were eligible for full Medicaid to ESO coverage.” Concurring Op. at 294 (quoting R. 70-14 at 4). The citation refers to immigrants from two countries, Cuba and Haiti, that apparently had difficulty with the computer system in June 2015. But there is no evidence that the Department failed to correct this error as well— and no evidence that any immigrants from these countries owed benefits are not getting them. No less importantly, this is not a class action on behalf of Cuban and Haitian immigrants, and indeed none of the named plaintiffs comes from Cuba or Haiti. This is a class action on behalf of all immigrants from all countries. At most, this email (but for the other problems) might permit the continuation of a class action on behalf of immigrants from Cuba and Haiti. But that is not what the majority opinion says or what Judge White proposes.
That human error may lead to future erroneous assignments or computer code mistakes does not justify a lawsuit that seeks a never-ending injunction. Otherwise, City of Los Angeles v. Lyons, 461 U.S. 95, 109-12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983), would have come out differently. Lyons rejected as unduly speculative (for Article III purposes) a request for a future injunction against a police department’s use of chokeholds by an individual improperly subjected to a chokehold by officers from that department before. Today’s injunction — to obey the relevant statutes and constitutional provisions in the future — looks a lot like the one rejected in Lyons. In truth, it is even broader. The injunction instructs the Department “broadly to obey the statute” and the Constitution “and thus subjects] the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to” the original computer system error. NLRB v. Express Publ’g Co., 312 U.S. 426, 435-36, 61 S.Ct. 693, 85 L.Ed. 930 (1941).
The setting of this injunction makes it particularly hard to accept. It is inevitable that errors will occur in implementing any complex benefits programs. Just look at the Social Security program. See, e.g., Mathews v. Eldridge, 424 U.S. 319, 346 n.29, 96 S.Ct. 893, 47 L.Ed.2d 18 (overall error rate of 12.2% for Social Security disability benefits program). Or consider the challenges of implementing the national healthcare law. Yet Unan and Quintino, as their counsel acknowledged at oral argument, don’t believe any error rate, whether 10% or 0.00001%, would demonstrate that the Department has resolved the “systemic errors” in Michigan’s Medicaid benefits program. If that’s the case, this lawsuit has no end. The “systemic error” is the fact that no one person, and thus no one computer system, is beyond reproach. That’s not enough to maintain a case or controversy in any setting. And it’s assuredly not enough to maintain one in this setting — where the Department has given Unan and Quintino everything they asked for.
The same goes for the notice claims. Federal courts may overcome a State’s sovereign immunity only with prospective injunctions, see Ex parte Young, 209 U.S. 123, 159, 28 S.Ct. 441, 52 L.Ed. 714 (1908), and Michigan has been issuing revised notices, concededly constitutional, since May 2015. There is no plausible argument that Michigan will revert back to the old notices or reinsert the same computer error that it spent months fixing. See Friends of *298 the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 190, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000). At any rate, we must treat the voluntary “cessation of the allegedly illegal conduct by government officials ... with more solicitude ... than similar action by private parties.” Mosley v. Hairston, 920 F.2d 409, 415 (6th Cir. 1990) (quotation omitted). The notice claims, like the Medicaid benefits claims, are moot. And even if the belatedly raised retroactive' notice issue remained live and unaffected by Michigan’s sovereign immunity, the court agrees that the retroactive notices do not violate due process. See Lead Op. at 291-92.
If the “inherently transitory” exception to mootness allows us to sidestep these realities, and if it applies to “systemic errors” without any built-in expiration dates, I am concerned. The exception was designed to “focus[ ] on the fleeting nature of the challenged conduct giving rise to the claim, not on the defendant’s litigation strategy.” Genesis Healthcare Corp. v. Symczyk, — U.S. -, 133 S.Ct. 1523, 1531, 185 L.Ed.2d 636 (2013). We seem to be at the bottom of a long, steep, and icy slope and may want to consider how we got here.
For these reasons, I would affirm the district court across the board. The court seeing it otherwise on the mootness decision, I respectfully dissent from that part of its ruling.